IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD G. YOUNG, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-380 |
| | ) | |
| v. | ) | District Judge David S. Cercone |
| | ) | Magistrate Judge Cynthia Reed Eddy |
| DR. KAHN, Psychiatrist; *ET AL.*, | ) | |
| Defendants. | ) | |
| | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I**.   **RECOMMENDATION**

For the reasons that follow, it is respectfully recommended that the Motion for Summary Judgment filed by Defendant Jin (ECF No. 87) be granted, that the Motion for Summary Judgment filed by Defendant Kahn (ECF. No. 94) (joined by Defendants Dietz and Valko) (ECF No. 123) be granted and that the Court *sua sponte* grant summary judgment in favor of Defendant Dr. Bratton (not Bradley as alleged in the Complaint). *See* Gibson v. Mayor and Council of City of Wilmington, 355 F.3d 215, 224 (3d Cir. 2004).

**II.   REPORT**

On March 11, 2011, Plaintiff, Leonard Young, Jr., an inmate currently confined in the State Correctional Institution at Pittsburgh, initiated this *pro se* prisoner's civil rights action pursuant to 42 U.S.C. § 1983 against the following individuals employed at the State Correctional Institution at Greene (SCI-Greene):  Dr. Khan, Psychiatrist; Dr. Byunghak Jin, Medical Director; Ms. Irma Vihlidal, Corrections Health Care Administrator (CHCA); Dr. Bratton, Psychiatrist; Dr. Valko, Psychologist, and Dr. Dietz, Chief Psychologist.  The case was referred to then Magistrate Judge Cathy Bissoon.  On August 29, 2011, Plaintiff filed an Amended Complaint (ECF No. 20).  Subsequently, Defendants filed Motions to Dismiss and the

case was reassigned to me on October 27, 2011 upon the elevation of Cathy Bissoon to the District Court. On February 21, 2012, I issued a Report and Recommendation recommending that the pending motions to dismiss be denied. On March 23 19, 2011, Chief District Judge Gary L. Lancaster issued a Memorandum Order denying the motions to dismiss (ECF No. 52).

On March 26, 2012, I entered an Order for discovery. Subsequently, on July 26, 2012, Dr. Jin filed a Motion for Summary Judgment (ECF No. 87), a Brief in Support thereof (ECF No. 88), and a Concise Statement of Material Facts (CSMF) (ECF No. 89). On July 27, 2012, Commonwealth Defendant Vihlidal filed a Motion for Summary Judgment (ECF No. 91), a Brief in Support thereof (ECF No. 92), and a CSMF (ECF No. 93) and Dr. Kahn filed a Motion for Summary Judgment (ECF No. 94), a Brief in Support thereof (ECF No. 95), and a CSMF (ECF No. 96).

On July 31, 2012, I issued an Order for Plaintiff to file responses to the pending motions for summary judgment (ECF No. 98). That four-page order specifically informed Plaintiff that the Local Rules of the United States District Court for the Western District of Pennsylvania require that a party opposing a motion for summary judgment file a responsive "concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by: (a) admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material; (b) setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety ... with appropriate reference to the record; and (c) setting forth ... any other material facts that are allegedly at issue and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgment." L.R. 56.C.1. In addition, that Order clearly stated that, pursuant to our Local Rule 56.E, alleged material facts set forth in the

moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will, for the purpose of deciding the motion for summary judgment, be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

Plaintiff filed a Response (ECF No. 103), a Brief in Opposition (ECF No. 104) and Appendix (ECF No. 105). However, Plaintiff's responses do not comport with the specific requirements set forth in our Local Rules. Nor did he file any concise counter statement of facts. Consequently, in accordance with our Local Rules, all factual averments contained in the Defendants' CSMFs will be deemed admitted for purposes of summary judgment. *Accord* Enigh v. Miller, Civil No. 08-1726, 2010 WL 2926213 (W.D. Pa. July 23, 2010) (collecting cases). *See also* Cuevas v. United States, Civil No. 09–43J, 2010 WL 1779690, at * 1 (W.D. Pa. Apr.29, 2010) ("Plaintiff's response to Defendant's Motion does not contain any basis for any ... denial of a fact and also fails to reference the record for each such denial. Though this Court must give certain latitude to a *pro se* litigant, it is not for the Court to sort through the entire record to determine the basis of an alleged disputed fact. As Plaintiff has failed to comply with our local rules, Defendant's Statement of Facts as set forth in [its Concise Statement of Material Facts] are admitted as true and correct.").[1]

## A. Standard of Review

Federal Rule of Civil Procedure 56(a)[2] provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is

---

[1] *See also* Jourdan v. Jabe, 951 F.2d 108, 109 (6th Cir. 1991) ("While *pro se* litigants may be entitled to some latitude when dealing with sophisticated legal issues, acknowledging their lack of formal training, there is no cause for extending this margin to straightforward procedural requirements that a layperson can comprehend as easily as a lawyer."). In short, a *pro se* litigant's failure to comply with a court order is not the same thing as "inartful pleading or a[ ] lack of legal training." *Id*. at 110.

entitled to judgment as a matter of law." When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. F. R. Civ. P. 56(e); Williams v. Borough of West Chester, 891 F.2d 458, 460–461 (3d Cir. 1989) (the non-movant must present affirmative evidence -- more than a scintilla but less than a preponderance -- which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party cannot rest "solely on assertions made in the pleadings, legal memoranda, or oral argument," Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), but must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (*i.e.*, depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. *See also* Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine

---

[2]    Pursuant to the 2010 amendments to the Federal Rules of Civil Procedure, the oft-cited summary judgment standard is now located in Rule 56(a) rather than 56(c), with a slight change of wording. Although the word "issue" has been replaced with "dispute," this change does not affect the substantive standard or the applicability of prior decisions construing the standard. *See* Fed. R. Civ. P. 56(a) advisory committee's note.

and material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52).  "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the non-moving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).  Moreover, *pro se* pleadings are to be construed liberally.  Haines v. Kerner, 404 U.S. 519, 520 (1972).

## B. Material Facts

The basis of Plaintiff's suit is his belief that he has been denied proper mental health during his incarceration at various DOC facilities.  In this regard, he asserts that he has been treated since he was a child for mental health problems at a number of different hospitals and institutions and has been diagnosed with a series of serious mental health problems.  Since his incarceration, Plaintiff has incurred over 112 misconducts, which resulted in disciplinary time until 2027, long after his maximum sentence will have run.  He complains that his failure to successfully integrate into prison society is the result of improper mental health treatment.  He further complains that he was placed into restraints on repeated occasions and has made repeated suicide attempts, which are the result of his deteriorating mental health condition caused by being housed in restrictive prison environments instead of being given proper mental health treatment in a dedicated facility.

Relevant to the case at bar are the following record facts.  Plaintiff was transferred to SCI-Greene at the end of June of 2009.  Just before he left SCI-Forest, he spent some time in a

psychiatric observation cell (POC) after asserting that he was going to "hang up." While in the POC he took his wicket (food slot) hostage and at some point actually managed to get out of his cell and became assaultive with the staff. When he was put back into his cell he said he would harm himself, but denied saying that when asked about it by psychiatrist Jeffrey Moll, M.D., and accused staff of fabricating the statement to "set him up." He was discharged from the POC after a couple of days. Dr. Moll diagnosed him as malingering with an Axis II diagnosis of antisocial personality disorder.

When he arrived at SCI-Greene, he was housed in a POC and evaluated before he was moved to the restricted housing unit (RHU). The psychology staff noted that he gave inconsistent information about whether he felt like harming himself. The psychologists noted he was immature but cooperative and attention-seeking.

Dr. Khan treated Plaintiff from his arrival at SCI-Greene. Dr. Khan prepared a very detailed initial assessment noting that Plaintiff said he had been previously diagnosed with bipolar disorder and schizoaffective disorder. He refused any psychiatric medications at that time and said he wanted to work with the psychology department on therapy. Dr. Khan's working diagnoses at that time included antisocial personality disorder, borderline personality disorder, and intermittent explosive disorder; he wanted to rule out depressive disorder NOS (not otherwise specified), and dysthymic disorder.

A subsequent determination was made for a possible referral to the Special Management Unit (SMU) (a DOC specialized "carrot and stick" program to reduce misconduct time) at SCI-Fayette. A psychological evaluation for his SMU placement was prepared by psychological services specialist Robert Dietz and Administrator David Yanak. In this assessment, they noted that Plaintiff said he was willing to participate in the program and claimed he understood that he

would be required to make more appropriate decisions in resolving conflicts with others in an effort to get off of disciplinary status. They further noted that there appeared to be no mental health concerns. Dr. Khan continued seeing Plaintiff on a monthly basis, until his transfer to SCI-Fayette. Dr. Khan noted he behaved manipulatively and wanted to be transferred to a Secure Special Needs Unit (SSNU) instead of the SMU. He made constant and ever changing complaints. He said he wanted to go back on medication but wouldn't say why or what he felt it would do for him; he refused Dr. Khan's suggestion for Lithium. When Plaintiff said that he wanted to try Sinequan, Dr. Khan prescribed it for him, and then increased the dose when Plaintiff said it was helpful. Dr. Khan noted he regularly reviewed treatment options with Plaintiff and the available resources. His diagnosis continued to be antisocial personality disorder and related behavioral problems. In March of 2010, before he was transferred to SCI-Fayette, Plaintiff began refusing his medications.

Plaintiff was evaluated upon his arrival in the SMU at SCI-Fayette by psychologist Lou Bozell. He noted Plaintiff's history of mental health treatment and suicide attempts, and that he had been evaluated at the Mental Health Unit (MHU) at SCI-Cresson in 2007. At SCI-Fayette, Plaintiff was regularly treated for his mental health concerns by Dr. Peter Saavedra. Soon after his arrival, he refused to take Sinequan anymore and it was discontinued. Dr. Saavedra prescribed other medications instead. During this period Plaintiff had a few stays in the POC. In late March he threatened to kill himself and was kept under constant observation in the POC until he asked to be discharged. He was sent to a camera cell in the SMU as a precaution at Dr. Saavedra's request.

In April of 2010, a treatment plan was developed for Plaintiff. Plaintiff continued to periodically refuse his medications and repeatedly instigated other inmates in the SMU, yelling

from his cell door.  In June of 2010, he was again put into the POC.  He used the intercom to report he was going to hang up but staff found him no indication he was about to do so.  He said he heard voices and that he was delusional and that the voices told him to smear feces.  Dr. Saavedra's diagnosis was probable malingering but to rule out psychosis he prescribed the antipsychotic Risperdal.  Plaintiff then put a bed sheet around his neck and stood on the toilet but used his call button before doing anything and obeyed psychologist Bozelli when told to take the noose off and get down.  There was no evidence of a bona fide psychosis and he was sent back to the SMU taking Risperdal, Navane and Cogentin.  He continued to be kept in a camera cell.

Over the summer he was regularly seen and evaluated by Mr. Bozelli and Dr. Saavedra. Dr. Saavedra talked to the Unit Manager who said he still had behavioral problems, *e.g*, he had recently taken his wicket hostage, was very impulsive and manipulative, and became angry if he did not get what he wanted.  In July, he had to be put in restraints after he refused to comply with orders and then broke a window in his cell.  He was regularly evaluated while in restraints and they were removed on the second day.  In August, he had to be extracted from his cell and put in the POC in four point restraints.  When they proposed removing the restraints, Plaintiff said he would be disruptive if they did so.  He told Dr. Saavedra that he wanted to go back to his home prison and he believed if he remained agitated and in four point restraints, this would expedite the process, and that he planned to remain in restraints for three or four days.

A few days after he was taken out of restraints and sent back to his cell, he attempted to hang himself.   He was taken to the local ER where he joked with the hospital staff and flirted with an EMT.  Multiple staff, including Dr. Saavedra, noted they concluded that this was further manipulative behavior and that he wanted to be sent to a MHU.

In September of 2010, while in the camera cell in the SMU, he ripped up his mattress and fashioned a noose while staff watched, and became angry and combative when they intervened. Consequently, he was sent to the Mental Health Unit (MHU) at SCI-Cresson on a § 302 involuntary commitment. On Sept. 30, 2010, a teleconference was held between staff at SCI-Fayette and SCI-Cresson. The Cresson staff reported him to be entitled, demanding, narcissistic, borderline and antisocial. Cresson staff stated that Plaintiff was "an actor" and would act out when he didn't get what he wanted. When informed he would be going back to SCI-Fayette he began acting out again and said he wanted to be sent back to his home prison. Cresson staff said they believed that he would continue to be a problem at SCI-Fayette until he was sent to his home prison. They diagnosed him with a personality disorder.

Plaintiff was transferred to SCI-Fayette for a week and then to SCI-Greene where he came back under Dr. Khan's care. On Oct. 1, 2010, when he returned to SCI-Fayette, he was immediately prescribed Cogentin, Celexa, Depakote and Risperdal, in addition to aspirin and his asthma medications. He was seen by Dr. Bratton (not Bradley as alleged in the Complaint) on Nov. 8, 2010. Dr. Bratton changed the Trazodone order to twice a day as Plaintiff asked him to. On Dec. 2, 2010, Plaintiff told Dr. Khan that the medicines were helping.

On December 9, 2010, Plaintiff covered the floor outside his cell with fecal matter he had thrown from his cell. In January of 2011, Plaintiff was observed with a toilet paper noose around his neck and said he was going to hang up. Although this was noted as attention seeking behavior, Plaintiff was admitted to the POC and seen by Dr. Khan. Plaintiff told him that he was not getting along with staff and was happy to be in the POC. Within two days he was complaining of being in the POC and was yelling and antagonizing staff and inmates. One of the

psychologists made a note that Dr. Khan was hoping that his medications would improve his behavior, and that his problems were behavioral problems. He was put on Seroquel.

Over February and March of 2011, Plaintiff continued to be seen by Dr. Khan and psychologists. At the end of March he decided not to take medications anymore, while acknowledging that he needed them. On March 24, 2011, his Complaint in this case was docketed.

In May of 2011, Plaintiff began to assert that he was passing out and falling to the floor when no one was looking, and staff watching him on camera would see him lying down on the floor then complaining he had fallen. He would then threaten to sue the staff for not treating his injuries from having fallen. In spite of this he was continually seen by Dr. Jin and other staff. He threatened to bite a correctional officer on the jugular vein and murder his family. Later in May he threatened to hang himself again and had to be put in a restraint chair. He was removed from restraints later the same day. A couple days later, he told a nurse that he wanted to be put in the restraint chair. He wanted to go back to the MHU and told staff that he had swallowed glass and tried to hang himself in order to try to persuade them to transfer him. Plaintiff was closely monitored by medical who found no evidence that Plaintiff had swallowed glass. Dr. David Yanak noted that Young claimed to "enjoy manipulating others to get the things he wants." In June of 2011, Plaintiff told Dr. Khan that, because he had been diagnosed with a mental illness, he wanted to be transferred to a hospital.

In his Amended Complaint, Plaintiff makes numerous claims against Defendants with respect to his conditions of confinement. In Count One, he claims that Defendants violated the Eighth Amendment by failing to provide adequate medical treatment. In Count 2, he claims that Defendants violated the Eighth Amendment by using excessive force in restraining him. In

Count 3, he claims that Defendants violated his rights under the Equal Protection Clause by failing to provide him required mental health treatment as required by the Pennsylvania Mental Health Procedures Act, 50 P.S. 7101. In Count 4 he claims that Defendants violated his rights as protected by the Fourteenth Amendment by his placement in restrictive custody. In Count 5 he asserts a claim of medical malpractice and in Count 6, he asserts claims of negligence.

## C. Exhaustion of Administrative Remedies

In the Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. § 1997e, concerning suits by prisoners. Before the amendments, prisoners challenging the conditions of their confinement under 42 U.S.C. § 1983 were not required to exhaust administrative remedies before filing suit. The PLRA amended section 1997e(a), as follows, making exhaustion a mandatory requirement.

(a)     Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a), as amended.

The United States Court of Appeals for the Third Circuit analyzed the applicability of the exhaustion requirement in 42 U.S.C. § 1997e in Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000) (Bivens action brought by a federal inmate) and Booth v. Churner, 206 F.3d 289 (3d Cir. 2000) (civil rights action brought by a state prisoner). In each of these cases, the Court of Appeals announced a bright line rule that inmate-plaintiffs must exhaust all available administrative remedies before they can file an action in federal court concerning prison conditions. In so holding, the court specifically rejected the notion that there is ever a futility exception to section

1997e(a)'s mandatory exhaustion requirement. <u>Booth</u>, 206 F.3d at 300; <u>Nyhuis</u>, 204 F.3d at 66.

A unanimous Supreme Court affirmed the Court of Appeals' holding in <u>Booth</u> where the Court

confirmed that in the PLRA Congress mandated complete exhaustion of administrative remedies,

regardless of the relief offered through those administrative procedures. *See* <u>Booth v. Churner</u>,

532 U.S. 731 (2001) (holding that the PLRA requires administrative exhaustion even where the

grievance process does not permit award of money damages and prisoner seeks only money

damages, as long as grievance tribunal has authority to take some responsive action). In

addition, in <u>Porter v. Nussle</u>, 534 U.S. 516 (2002), the Supreme Court clarified that the PLRA's

exhaustion requirement applies to all inmate suits concerning prison life, whether they involve

general circumstances or specific episodes and whether they allege excessive force or other

conduct.

The Court of Appeals for the Third Circuit repeatedly has instructed that a prisoner's

failure to comply with the procedural and substantive requirements of DOC's grievance policy[3]

results in procedural default, thereby precluding an action in federal court. *See* <u>Torrence v.</u>

<u>Thompson</u>, 435 F. App'x 56, 593 (3d Cir. 2011) (state inmate's assertion that he needed his

limited funds to pursue his civil rights lawsuits against state corrections department did not

warrant excusing his failure to exhaust administrative remedies through prison grievance

process, due to his refusal to submit copies of items required to perfect appeal); <u>Banks v.</u>

<u>Roberts</u>, 251 F. App'x 774 (3d Cir. 2007) (holding that federal prisoner, who did not wait to file

---

[3]  The administrative grievance procedure for Pennsylvania inmates is codified in the Pennsylvania Department of
Corrections Policy Statement No. DC-ADM 804-1, entitled "Consolidated Inmate Grievance Review System." The
purpose of the grievance system is to insure that every inmate confined in a Bureau of Correction facility has an
avenue through which prompt resolution of any problem which arises during the course of confinement may be
sought. The grievance system applies to all state correctional institutions and provides three levels of review:  1)
initial review by the facility grievance coordinator; 2) appeal of initial review to the superintendent or regional
director; and 3) final appeal to the Secretary's Office. The administrative policy further provides that, prior to
utilizing the grievance system, prisoners are required to attempt to resolve problems on an informal basis through
direct contact or by sending an inmate request slip to the appropriate staff member.

his <u>Bivens</u> complaint in federal court until after he had received final determinations from his administrative filings and completed the appeal process as to those determinations, failed to comply with PLRA mandatory exhaustion requirement); <u>Spruill v. Gillis</u>, 372 F.3d 218 (3d Cir. 2004). [4]

In the case at bar, DOC records show that the only grievances Plaintiff filed to all levels of DOC administrative review concerned his perceived lack of adequate medical care. Consequently, that is the only issue that must be addressed in this action.[5]

## D. <u>Liability under 42 U.S.C. § 1983</u>

The Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements.  He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  <u>West v. Atkins</u>, 487 U.S. 42 (1988); <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, <u>Daniels v. Williams</u>, 474 U.S. 327, 330-331 (1986).

To establish personal liability against a defendant in a section 1983 action, that defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior.  <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976).  Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct.  <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d

---

[4]  The United States Supreme Court adopted a similar holding in <u>Woodford v. Ngo</u>, 548 U.S. 81 (2006) wherein it held that an untimely or otherwise procedurally defective administrative grievance or appeal does not satisfy the PLRA's mandatory exhaustion requirement.

[5]  Moreover, an inmate cannot satisfy the PLRA by completing the prison grievance process during the pendency of

Cir. 1988); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. <u>Rode</u>, 845 F.2d at 1207. *See also* <u>Keenan v. Philadelphia</u>, 983 F.2d 459, 466 (3d Cir. 1992); <u>Andrews v. Philadelphia</u>, 895 F.2d 1469, 1478 (3d Cir. 1990).

Moreover, a supervising public official has no affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates. Notwithstanding, when a supervising official knowingly permits a continuing custom or policy that results in harm to the plaintiff, 1983 liability may attach. <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 673 (3d Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989) (Colburn I). However, at a minimum such liability may be imposed "only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Id*. (quoting <u>Chinchello</u>, 805 F.2d at 133). *See also* <u>Bonenberger v. Plymouth Township</u>, 132 F.3d 20, 25 (3d Cir. 1997).

E. The Eighth Amendment

Plaintiff's allegations invoke liability under the Eighth Amendment, which provides as follows.

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The Eighth Amendment protects individuals against the infliction of "cruel and unusual punishments." This protection, enforced against the states through the Fourteenth Amendment,

the District Court proceeding. <u>Nifas v. Beard</u>, 374 F. App'x 241, 245 (3d Cir. 2010).

guarantees incarcerated persons humane conditions of confinement.   In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

Notwithstanding, not every injury raises constitutional concerns.  A prison official violates the Eighth Amendment only when two requirements are met.  The inmate must show that:   1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to such risk.  Farmer, 511 U.S. at 834.  The first element is satisfied when the alleged "punishment" is "objectively sufficiently serious." *Id*.  In determining whether a prisoner has alleged a risk that is  objectively serious, a court must consider not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.  Helling v. McKinney, 509 U.S. 25, 35 (1993).

The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind.  The Supreme Court clarified this deliberate indifference standard in Farmer as follows.

> We reject petitioner's invitation to adopt an objective test for deliberate indifference.  We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  This approach comports best with the text of the Amendment as our cases have interpreted it.  The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."  An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. . . .  But an official's failure to alleviate a

significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-838 (emphasis added).

Plaintiff asserts an Eighth Amendment claim alleging failure to provide adequate medical treatment. To state an Eighth Amendment violation in the context of medical treatment, an inmate must show prove two elements: 1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need. Gamble v. Estelle, 427 U.S. 107 (1978). The first showing requires the court objectively to determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993). *See also* Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979) (noting that the failure to provide necessary psychological or psychiatric treatment to inmates with serious mental or emotional disturbances will result in the infliction of pain and suffering just as results from the failure to treat serious physical ailments).

a.  Serious Medical Need

A plaintiff alleging constitutionally inadequate medical treatment must submit medical evidence of a "serious medical need" sufficient to satisfy the objective component of the test. Boring v. Kozakiewicz, 833 F.2d 468 (3d Cir. 1987). In Boring, the Court of Appeals for the Third Circuit determined that, because plaintiffs failed to produce expert testimony that their injuries were "serious," they failed to meet their burden of proof. The court explained that expert testimony would not necessarily be required in situations where the seriousness of injury or illness would be apparent to a lay person, *e.g.*, a gunshot wound. Boring, 833 F. 2d at 473 (citing City of Revere v. Massachusetts General Hosp., 463 U.S. 239 (1983)). With respect to an ulnar nerve injury and migraine headaches, however, the Court concluded that a fact finder would not be able to determine that the condition was "serious" because the need for treatment did not appear to be "acute." *Id*. With respect to a scalp condition and complaints about dental care, the Court found that the complaints merely reflected a disagreement over the proper method of treatment. In so concluding, the Court noted that "courts will not 'second-guess the propriety or adequacy of a particular course of treatment [which] remains a question of sound professional judgment.'" *Id*. (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)). Finally, with respect to a prior knee injury, the Court found that the evidence did not establish an acute condition.

> As laymen, the jury would not be in a position to decide whether any of the conditions described by plaintiffs could be classified as "serious." In these circumstances, the district court properly required expert medical opinion and in its absence properly withdrew the issue from the jury.

Boring, 833 F.2d at 474 (citations omitted).

Here, Plaintiff has not included any expert evidence to substantiate the existence of any serious psychological need for a different kind of treatment than he received and presumably, still is receiving. Moreover, the record evidence belies his contentions in this regard. None of

the many doctors who examined and treated him during the relevant time period diagnosed him with any specific mental illness requiring a different method of treatment from what he was receiving. As with the medical complaints in <u>Boring</u>, a lay person would not be able to conclude that Plaintiff's unsubstantiated allegations constituted a "serious medical need" without expert testimony or evidence. Thus, Plaintiff has failed to meet his burden of demonstrating a genuine issue of fact about whether Defendants ignored a critical or escalating medical situation or that their actions posed a substantial risk of serious harm. Because evidence of this nature is required in this type of case, Plaintiff's failure to meet this burden is fatal to his case. *Accord* <u>Sherrer v. Stephens</u>, 50 F.3d 496, 497 (8th Cir. 1995) (inmate failed to submit sufficient evidence that defendants ignored an acute or escalating situation or that delays adversely affected his prognosis, given the type of injury in this case); <u>Beyerbach v. Sears</u>, 49 F.3d 1324 (8th Cir. 1995) (inmate failed to present any verifying medical evidence to establish the objective component of his claim); <u>Hill v. Dekalb Regional Youth Detention Ctr.</u>, 40 F.3d 1176, 1188 (11th Cir. 1994) (an inmate complaining that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to succeed); <u>Lopez v. Robinson</u>, 914 F.2d 486, 490 (4th Cir. 1990) (to objectively determine whether a "serious deprivation" of a basic human need has occurred (*i.e.*, whether prison conditions to rise to the level of unconstitutional punishment), there must be evidence of a serious medical and emotional deterioration attributable to the challenged condition).

b.        <u>Deliberate Indifference</u>

Moreover, even if the court were to conclude that Plaintiff has demonstrated the existence of a serious medical need, a finding this Court specifically does not make, he has failed to demonstrate that Defendants were deliberately indifferent to it. The "deliberate indifference"

standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified." *Id*. Moreover, deliberate indifference to a serious medical need of a prisoner is distinguishable from a negligent diagnosis or treatment of a medical condition; only the former conduct violates the Eighth Amendment. Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

The Supreme Court explained the difference between negligence and constitutional claims in Estelle v. Gamble, 427 U.S. 97, 104 (1978). In that case, the prisoner, Gamble, was injured when a bale of cotton fell on him while he was unloading a truck. He went to the unit hospital where a medical assistant checked him for a hernia and sent him back to his cell. He returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, his injury was diagnosed as a lower back strain; he was prescribed a pain reliever and a muscle relaxant. Over the course of several weeks, Gamble was seen by several doctors who prescribed various pain relievers and provided him with medical work excuses. Ultimately, despite his protests that his back hurt as much as it had the first day, medical staff certified Gamble to be capable of light work. During the next two months, Gamble received a urinalysis, blood test, blood pressure measurement, and pain and blood pressure

medication.  Subsequently, a medical assistant examined Gamble and ordered him hospitalized for treatment of irregular cardiac rhythm.

The Supreme Court held that Gamble's allegations failed to state a claim upon which relief could be granted against the defendant, both in his capacity as a treating physician and as the medical director of the Corrections Department.

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period . . ..  They treated his back injury, high blood pressure, and heart problems.  Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury."  The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers.  Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued.  The Court of Appeals agreed, stating:  "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing."  But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.

Gamble, 427 U.S. at 107 (internal citations omitted) (emphasis added).

Thus, while an intentional refusal to provide any medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.  A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice."  Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir.1981).  Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways

to treat an illness. White v. Napoleon, 897 F.2d 103, 110 (3d Cir.1990) (citations omitted). *Accord* Young v. Quinlan, 960 F.2d 351, 358 n. 18 (3d Cir.1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not state claim for relief under section 1983).

There is nothing in the record evidence that suggests that Defendants knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. To the contrary, the record evidence gleaned from Plaintiff's voluminous prison medical record fully supports the entry of summary judgment. Briefly stated, the record is undisputed that Plaintiff began receiving psychiatric treatment from mental health professionals shortly after his arrival at SCI-Greene and his care continued with frequency thereafter, including repeated evaluations, treatment with medications, counseling, and close observation of his status. Some of Plaintiff's recurring issues appear to have stemmed at least in part from his own lack of cooperation in taking prescribed medications. Nevertheless, numerous professionals tended to his mental health during the period at issue in this suit by responding promptly to his needs, including providing treatment following the suicide attempts and addressing Plaintiff's complaints about the medications.

The exercise by a doctor of his professional judgment is not deliberate indifference where an inmate's dissatisfaction with a course of medical treatment entails nothing more than a disagreement over alternate treatment plans. *See e.g.*, Gause v. Diguglielmo, 339 F. App'x 132 (3d Cir. 2009) (dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F. App'x 454 (3d Cir. 2009) (same); Rozzelle v. Rossi, 307 F. App'x 640 (3d Cir. 2008) (same); Whooten v. Bussanich, 248 F. App'x 324 (3d Cir. 2007) (same); Ascenzi v. Diaz, 247 F. App'x 390 (3d Cir. 2007) (same). The record evidence in

this case simply does not show that Defendants acted with deliberate indifference for purposes of imposing liability under the Eighth Amendment's prohibition against cruel and unusual punishment. Thus, Defendants are entitled to summary judgment with respect to this claim. *Accord* <u>Washington v. Showalter</u>, Civil No. 10-3513, 2012 WL 3641930, *3 (Aug. 27, 2012) (upholding District Court grant of summary judgment to healthcare administrator against prisoner alleging inadequate mental health treatment); <u>Sides v. Law</u>, 283 F. App'x 930, 933 (3d Cir. 2008) ("The District Court did not err in finding that Beard and Law reasonably believed that Sides's placement in the SMU was appropriate and reasonably believed that, to the extent it was needed, Sides had the "opportunity to receive adequate mental health treatment. There was, in short, sufficient evidence for the District Court to conclude that Beard and Law were not deliberately indifferent to Sides's medical needs.").

## F. <u>State Claims</u>

Plaintiff asserts state claims of negligence and medical malpractice in his Amended Complaint. A federal court has "supplemental jurisdiction" over claims that are "part of the same case or controversy" as a claim over which the court has original jurisdiction. 28 U.S.C. § 1367(a). Subsection 1367(c) authorizes a federal court to decline jurisdiction over state claims even though the court has federal jurisdiction when:

1.      the claim raises a novel or complex issue of State law;

2.      the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

3.      the district court has dismissed all claims over which it has original jurisdiction; or

4.      in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. §1367(c).

When "the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995). This Report recommends that summary judgment be granted to Defendants on all claims. It follows that any remaining state law claims should be dismissed as considerations of judicial economy, convenience, and fairness to the parties do not provide an affirmative justification for retaining jurisdiction. *Accord* Lovell Manufacturing v. Export-Import Bank of the U.S., 843 F.2d 725, 734 (3d Cir. 1988).

**III.    CONCLUSION**

Based on the discussion above, it is respectfully recommended that the Motion for Summary Judgment filed by Defendant Jin (ECF No. 87) be granted, that the Motion for Summary Judgment filed by Defendants Kahn, Dietz and Valko (ECF. No. 94) be granted and that the Court *sua sponte* grant summary judgment in favor of Defendant Dr. Bratton. *See* Gibson v. Mayor and Council of City of Wilmington, 355 F.3d 215, 224 (3d Cir. 2004).

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and the Local Rules, the parties are allowed fourteen (14) days from the date of service to file written objections to this report. Any party opposing the objections shall have 14 days from the date of service of the objections to respond thereto. Failure to timely file objections will constitute a waiver of any appellate rights.


February 5, 2013

/s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

Leonard G. Young, Jr.
GN-9516
SCI Pittsburgh
PO Box 99991
Pittsburgh, PA 15233

Leonard G. Young, Jr.
13-0076
Centre County Correctional Facility
700 Rishel Hill Road
Bellefonte, PA 16823-1488